**No. 24-1364**

**In the**
**United States Court of Appeals**
**For the Third Circuit**

SAM A. ANTAR,

*Plaintiff-Appellant,*

v.

THE BORGATA HOTEL CASINO & SPA, LLC; B ONLINE CASINO;
BETMGM, LLC; MGM RESORTS INTERNATIONAL, INC.; ENTAIN PLC;
JOHN DOES 1-10; MARY DOES 1-10; AND XYZ CORPORATIONS 1-10,

*Defendants-Appellees.*

On Appeal from the United States District Court for the District of New Jersey
Civil Case No. 2:22-05785, Honorable Madeline Cox Arleo, U.S.D.J.

**BRIEF OF DEFENDANT-APPELLEE BETMGM, LLC**

Dated: July 25, 2024

**BLANK ROME LLP**
*A Pennsylvania LLP*
Stephen M. Orlofsky
New Jersey Resident Partner
Daniel E. Rhynhart
Lauren E. O'Donnell
Michael R. Darbee
300 Carnegie Center, Suite 220
Princeton, NJ 08540
Telephone: (609) 750-7700
Stephen.Orlofsky@BlankRome.com
Dan.Rhynhart@BlankRome.com
Lauren.Odonnell@BlankRome.com
Michael.Darbee@BlankRome.com
*Attorneys for Defendant-Appellee*
*BetMGM, LLC*

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ............................................................................................1

STATEMENT OF THE ISSUES...................................................................4

STATEMENT OF THE CASE.......................................................................5

1.  The Casino Control Act. ....................................................................5

2.  The Consumer Fraud Act. ..................................................................9

3.  The Litigation. ..................................................................................10

  A.  The Original Complaint. ................................................................10

  B.  The Amended Complaint. ..............................................................11

  C.  The District Court's Dismissal Order. ..........................................13

SUMMARY OF THE ARGUMENT ...........................................................16

ARGUMENT ...............................................................................................20

1.  Standard of Review...........................................................................20

2.  Defendants' Alleged Conduct Is Exempt from the Consumer Fraud Act.....21

  A.  Plaintiff's Consumer Fraud Act Claim Conflicts with the Casino Control Act's Detailed Problem Gambling Regulations. ......................................21

  B.  The District Court Correctly Applied Governing New Jersey Law and Held That Defendants' Alleged Conduct Was Exempt from the Consumer Fraud Act. .................................................26

3.  BetMGM Does Not Owe Plaintiff a Duty of Care. .........................30

  A.  Considerations of Fairness and Public Policy Belie the Existence of a Duty from BetMGM to Plaintiff. ..........................................30

  B.  This Court Should Not Impose a Novel Duty of Care on Casinos. ...........35

CONCLUSION .............................................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All the Way Towing, LLC v. Bucks Cnty. Int'l, Inc.*,
   236 N.J. 431 (2019) ..............................................................9

*Bandler v. Landry's Inc.*,
   464 N.J. Super. 311 (App. Div. 2020) ......................27, 28, 36

*In re Borgata Winter Poker Open*,
   A-4409-13T3, A-0231-14T3, 2016 WL 4072219 (N.J. Super. Ct.
   App. Div. Aug. 1, 2016) ....................................................2, 23

*Bosland v. Warnock Dodge, Inc.*,
   197 N.J. 543 (2009) ..............................................................9

*Caesars Riverboat Casino, LLC v. Kephart*,
   934 N.E.2d 1120 (Ind. 2010) ...............................................31

*Campione v. Adamar of N.J, Inc.*,
   155 N.J. 245 (1998) ..............................................................6

*Cox v. Sears Roebuck & Co.*,
   138 N.J. 2 (1994) ..................................................................9

*Daaleman v. Elizabethtown Gas Co.*,
   77 N.J. 267 (1978) ..............................................................22

*Decker v. Bally's Grand Hotel Casino*,
   280 N.J. Super. 217 (App. Div. 1994) ..................................28

*Doug Grant, Inc. v. Greate Bay Casino Corp.*,
   232 F.3d 173 (3d Cir. 2000) ...........................................22, 27

*Duff v. Harrah South Shore Corp.*,
   125 Cal. Rptr. 259 (Ct. App. 1975) .....................................31

*Fowler v. UPMC Shadyside*,
   578 F.3d 203 (3d Cir. 2009) .................................................20

*Gonzalez v. Wilshire Credit Corp.*,
  207 N.J. 557 (2011) .......................................................................25

*Hakimoglu v. Trump Taj Mahal Assocs.*,
  70 F.3d 291 (3d Cir. 1995) ......................................................*passim*

*Hakimoglu v. Trump Taj Mahal Assocs.*,
  876 F. Supp. 625 (D.N.J. 1994), *aff'd*, 70 F.3d (3d Cir. 1995) .........................33

*Harrah's Atl. City Op. Co. v. Dangelico*,
  No. A-2158-17T3, 2019 WL 1869008 (N.J. Super. Ct. App. Div.
  Apr. 26, 2019) .................................................................30, 31, 32, 36

*Hopkins v. Fox & Lazo Realtors*,
  132 N.J. 426 (1993) .....................................................................30, 31

*Knight v. City of Margate*,
  86 N.J. 374 (1981) ..............................................................5, 6, 17, 22

*Lemelledo v. Ben. Mgmt. Corp. of Am.*,
  150 N.J. 255 (1997) ...............................................................*passim*

*Marcangelo v. Boardwalk Regency Corp.*,
  847 F. Supp. 1222 (D.N.J. 1994) ...............................................22, 28

*Merrill v. Trump Indiana, Inc.*,
  320 F.3d 729 (7th Cir. 2003) ...........................................................35

*Miller v. Zoby*,
  250 N.J. Super. 568 (App. Div. 1991) ...................................22, 23, 24

*Rahmani v. Resorts Int'l Hotel, Inc.*,
  20 F. Supp. 2d 932 (E.D. Va. 1998) .................................................31

*Real v. Radir Wheels, Inc.*,
  198 N.J. 511 (2009) .......................................................................21

*Smerling v. Harrah's Entertainment, Inc.*,
  389 N.J. Super. 181 (App. Div. 2006) ...........................27, 28, 29, 36

*Stevens v. MTR Gaming Grp., Inc.*,
  788 S.E.2d 59 (W. Va. 2016) ..........................................................31

iii

*Taveras v. Resorts Int'l Hotel, Inc.*,
   No. 07-4555, 2008 WL 4372791 (D.N.J. Sept. 19, 2008)..........................*passim*

## Statutes

N.J.S.A.§ 5:12-1(12) ....................................................................................5
N.J.S.A.§ 5:12-1(13) ....................................................................................5
N.J.S.A.§ 5:12-63 .........................................................................................6
N.J.S.A.§ 5:12-71.2(b)................................................................................25
N.J.S.A.§ 5:12-71.2(c)..................................................................................7
N.J.S.A.§ 5:12-76 .........................................................................................6
N.J.S.A.§ 5:12-129 .......................................................................................9
N.J.S.A.§ 56:8-2 .........................................................................................10

## Other Authorities

Fed. R. Civ. P. 12(b)(6)...............................................................................20

N.J.A.C.§ 13:69A-9.4(c) .....................................................................6, 8, 14
N.J.A.C.§ 13:69G-2.2 ............................................................................7, 33
N.J.A.C.§ 13:69G-2.2(a)......................................................................17, 24
N.J.A.C.§ 13:69G-2.2(d).........................................................................7, 17
N.J.A.C.§ 13:69O-1.2(x)........................................................................*passim*
N.J.A.C.§ 13:69O-1.2(b) ..............................................................................6
N.J.A.C.§ 13:69O-1.2(j) ...............................................................................6
N.J.A.C.§ 13:69O-1.2(z)........................................................................6, 14
N.J.A.C.§ 13:69O-1.9 ...........................................................................6, 14

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

BetMGM, LLC respectfully submits that oral argument is not necessary to resolve the straightforward issues raised on appeal.  However, should the Court order the parties to present oral argument, BetMGM, LLC reserves its rights to participate.

## **INTRODUCTION**

This appeal concerns whether the federal courts should disturb the reasoned policymaking of the New Jersey Legislature and the New Jersey gaming regulators, in the area of minutely regulated gaming law. The District Court declined to do so, and this Court should affirm.

The New Jersey gaming industry is a creature of the state constitution. It owes its entire existence to the New Jersey voters, who have entrusted their elected Legislature with overseeing the conduct of gaming operators through tailored, industry-specific regulations. To that end, the Legislature enacted the Casino Control Act, signed by the Governor in 1977, which subjects the New Jersey gaming industry to intense and pervasive regulation in virtually every aspect of gaming—from licensing to the minutiae of gaming rules, and everything in between.

One area subject to the Casino Control Act's pervasive regulation is problem gambling. The Casino Control Act requires gaming operators to provide patrons with information about problem gambling resources, to fund assistance programs, to train employees, to implement internal controls and programs to identify problem gambling behavior, and to provide patrons with options for responsible gaming limits. The Casino Control Act also gives patrons the ability to place themselves on a self-exclusion list, and gaming operators must undertake detailed steps to honor a self-exclusion request. Gaming operators who fail to abide by these problem

gambling regulations are subject to the jurisdiction of two State regulatory authorities: the Division of Gaming Enforcement and the Casino Control Commission. Those authorities may conduct fact-finding, hold hearings, and impose steep penalties on gaming operators who violate the problem gambling regulations.

The State's comprehensive scheme surrounding problem gambling controls the issues here. Plaintiff Sam A. Antar ("Plaintiff") alleges that he is a problem gambler who used Defendants' physical and online gambling services. He claims that Defendants, Borgata Hotel Casino and Spa ("Borgata"), MGM Resorts International ("MGM"), and BetMGM, LLC ("BetMGM"), offered him access to a special rewards program, that he joined that program, that Defendants offered him incentives to gamble under that program, and that he suffered excessive losses due to his compulsive gambling. He does not allege that any of those incentives were deceptive or misleading, and does not allege that he was on the self-exclusion list. In fact, Plaintiff acknowledges that Defendants complied with their obligations under the Casino Control Act to train employees in identifying problem gambling.

Yet, in the Amended Complaint, Plaintiff asserts claims under the New Jersey Consumer Fraud Act and for common law negligence, seeking to hold Defendants responsible for his compulsive gambling losses. The District Court dismissed both claims for failure to state a claim upon which relief can be granted, concluding: (1)

that New Jersey law exempts Defendants' alleged conduct from the Consumer Fraud Act, and (2) that New Jersey law would not impose a common law duty of care upon Defendants related to Plaintiff's allegations.

For several reasons, this Court should affirm.  <u>First</u>, under well-settled New Jersey law, highly regulated conduct is exempt from the Consumer Fraud Act when liability under that statute would lead to a direct and unavoidable conflict with another regulatory scheme.  Over and over, that rule has been applied to gaming operators.  And, over and over, courts decline to impose liability when it would conflict with technical provisions in the Casino Control Act and usurp the expertise of the two regulatory bodies that oversee gaming conduct.  That principle applies to the Casino Control Act's problem gambling regulations, and favors affirming the District Court.

Plaintiff purports to raise nine "issues" surrounding the dismissal of his Consumer Fraud Act claim.  However, they all reduce to one argument—namely, that because the Casino Control Act is "silent" on the conduct alleged in Plaintiff's Amended Complaint, it does not conflict with the Consumer Fraud Act.  Plaintiff is wrong.  The Casino Control Act is not "silent" on gaming operators' responsibilities to problem gamblers.  Rather, it embodies a comprehensive scheme requiring gaming operators to educate problem gamblers and to enforce any self-imposed limits on their gambling.  The regulators entrusted to implement the Casino Control

3

Act are responsible for enforcing those regulations and imposing penalties when they are violated. A Consumer Fraud Act claim would work at cross-purposes with the Casino Control Act by imposing vague requirements that the Legislature and two specialized regulatory agencies have declined to impose. The District Court's Order was therefore correct, and should be affirmed.

Second, there is no basis to impose a novel duty of care for gaming operators to bear financial liability to patrons for alleged problem gambling losses. Indeed, there is no legislative, case law, or factual support to do so. Plaintiff attempts to raise seven additional "issues" to support the existence of a duty—all of which involve purported legal and factual distinctions between this case and existing case law. But he has not provided any law or facts to justify this Court in creating a novel duty of care, especially when no other court or regulator has seen fit to do so. Accordingly, the District Court's Order should be affirmed.

## STATEMENT OF THE ISSUES

1.      Whether the District Court correctly held that Plaintiff failed to state a claim for relief under the New Jersey Consumer Fraud Act because liability under that statute would create a direct and unavoidable conflict with New Jersey's gaming laws? (Plaintiff's Appendix Vol. 1 ("Pa1"), pp. 11-13).

4

**2.**      Whether the District Court correctly held that Plaintiff failed to state a claim for negligence because BetMGM does not owe Plaintiff a duty of care relating to his problem gambling allegations?  (*Id.* at pp. 13-15).

## STATEMENT OF THE CASE

### 1.      The Casino Control Act.

In 1976, the New Jersey voters "approved casino gambling by voting in favor of an amendment to the Constitution." *Knight v. City of Margate*, 86 N.J. 374, 380 (1981).   Following that constitutional amendment, the New Jersey Legislature passed the Casino Control Act, N.J.S.A. § 5:12-1 *et seq.*  In doing so, the Legislature acknowledged that legalized gaming in New Jersey would result in significant benefits to the public.  *See, e.g.*, N.J.S.A. § 5:12-1(12) (declaring that that "the economic stability of casino operations is in the public interest . . . .").  At the same time, the Legislature determined that licensed gambling should be "strictly regulated and controlled." *Id.* § 5:12-1(13).

The Casino Control Act reflects New Jersey's careful application of those public policies.  Shortly after the Legislature enacted the Casino Control Act, the New Jersey Supreme Court observed that "[t]he statutory and administrative controls over casino operations established by the [Casino Control] Act are extraordinarily pervasive and intensive." *Knight*, 86 N.J. at 380-81.  The Casino Control Act touches on "virtually every facet of casino gambling and its potential impact upon

the public." *Id.* at 381.  To administer the Casino Control Act, the Legislature

created not one, but two, regulatory agencies—the Casino Control Commission,

N.J.S.A. § 5:12-63, and the Division of Gaming Enforcement, N.J.S.A. § 5:12-76.

*See Campione v. Adamar of N.J, Inc.*, 155 N.J. 245, 256 (1998).

One aspect of the Casino Control Act's "pervasive and intensive" regulation,

*Knight*, 86 N.J. at 381, deals with problem gambling.  The Casino Control Act

regulations address the issue in overwhelming detail.  *See, e.g.*, N.J.A.C. § 13:69O-

1.2(b) (requiring Internet gaming log-on screens to "prominently" display the

message "If you or someone you know has a gambling problem and wants help, call

1-800-Gambler"); *id.* § 13:69O-1.2(c) (requiring log-on screens to display the time

of the previous log-on); *id.* § 13:69O-1.2(h) (requiring gaming software to

"prominently" display the current time and current session duration "at least every

half hour"); *id.* § 13:69O-1.2(j) (requiring Internet gaming operators to maintain

internal controls for "reporting of problem gamblers"); *id.* § 13:69O-1.2(l)(9)-(10)

(requiring Internet gaming operators to maintain policies regarding a "[p]atron's

right to set responsible gaming limits and to self-exclude" and regarding a

"[p]atron's right to suspend his or her account for a period of no less than 72 hours");

*id.* § 13:69O-1.2(t) (prohibiting Internet gaming operators from inducing patrons to

continue wagering when the patron loses a bet or attempts to end a session); *id.* §

13:69O-1.2(z) (requiring an Internet gaming site to provide easy access during a

6

gaming session to a dedicated "responsible gaming page" with access to resources about problem gambling).

Among those detailed provisions, the Casino Control Act and its regulations provide problem gamblers with the ability to place themselves on an exclusion list. *See id.* § 13:69G-2.2 ("Any person may have his or her name placed on the self-exclusion list or Internet self-exclusion list by submitting a request in the form and manner required by this section.").  The Division of Gaming Enforcement notifies all gaming operators of individuals who self-exclude. *See id.* § 13:69G-2.3.  Gaming operators owe significant responsibilities to individuals on the self-exclusion list. *See, e.g.*, *id.* § 13.69O-1.2(i) (requiring Internet gaming operators to maintain a "key employee" who shall "immediately notify the Division" if an individual on the self-exclusion list attempts to gamble); *id.* § 13:69G-2.4 (listing gaming operators' duties to self-excluded patrons); *id.* § 13:69O-1.11(a) (requiring Internet gaming operators to prohibit self-excluded individuals from creating an account).  Notably, however, individuals on the self-exclusion list who break their self-exclusion cannot sue gaming operators for their losses.  *See, e.g.*, N.J.S.A. § 5:12-71.2(c); N.J.A.C. § 13:69G-2.2(d)(3)(ii)-(iv).

What is more, Internet gaming operators—such as BetMGM—must implement employee training programs to recognize problem gamblers, to direct

them to information about treatment and self-exclusion programs, and to respond to

reports about problem gambling behavior.  The regulation provides as follows:

> (x) All Internet gaming operators with employees who have direct contact with patrons via phone, e-mail, electronic chat, or other means, shall implement training for those employees, at the start of their employment and at regular intervals thereafter, addressing areas set forth in (y)1 through 3 below. If the training requirement under this subsection follows the standards set forth by the Council on Compulsive Gambling of New Jersey it shall be deemed sufficient.
>
> 1. Recognizing the nature and symptoms of problem gambling behavior and how to assist players in obtaining information regarding help for a gambling problem and self-exclusion programs;
>
> 2. Responding to patrons who may disclose that they have a gambling problem; and
>
> 3. Responding to reports from third parties, such as family members, about patrons who may have a gambling problem.

N.J.A.C. § 13:69O-1.2(x)(1)-(3).  A host of other regulations are directed to public

policy concerns surrounding problem gambling, as well.  *See, e.g.*, *id.* § 13:69A-

9.4(c)(5)-(6) (requiring a portion of sports wagering license fees to be allocated "for

evidence-based prevention, education, and treatment programs for compulsive

gambling . . . including the development and implementation of programs that

identify and assist problem gamblers"); *id.* § 13:69O-1.4(r) (requiring Internet

gaming operators to prevent gambling over a certain threshold unless the player

acknowledges their "capability to establish responsible gaming limits or close his or her account"); *id.* § 13:69O-1.9(l) (requiring Internet gaming operators to prepare weekly reports "identifying potential problem gamblers" and to "document any action taken").

Those detailed regulations reflect New Jersey's comprehensive and reasoned policy choices surrounding problem gambling. As explained, the Division of Gaming Enforcement imposes strict oversight of gaming operators and has provided them with detailed regulations about how to conduct their business in the face of problem gambling issues. A gaming operator who fails to comply with those regulations is subject to sanctions by the New Jersey Division of Gaming Enforcement, which may include license revocation, civil penalties, restitution, and injunctive relief. *See, e.g.*, N.J.S.A. § 5:12-129.

## 2.    <u>The Consumer Fraud Act.</u>

Against this regulatory framework, Plaintiff's Amended Complaint attempts to invoke the New Jersey Consumer Fraud Act, which is broad, remedial legislation. *See All the Way Towing, LLC v. Bucks Cnty. Int'l, Inc.*, 236 N.J. 431, 434 (2019). Its objective is "to greatly expand protections for New Jersey consumers," *Bosland v. Warnock Dodge, Inc.*, 197 N.J. 543, 555 (2009), and those protections "should be construed liberally in favor of consumers," *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 15 (1994). It prohibits the following:

> [t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing[ ] concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby.

N.J.S.A. § 56:8-2.  As explained below, Plaintiff contends that a claim under the Consumer Fraud Act should survive despite the Casino Control Act's unique policy concerns and its pervasive regulation of problem gambling.

**3.**    **The Litigation.**

A.    The Original Complaint.

Plaintiff is a convicted felon with a history of crimes stretching back decades. (D.E. 50-1).  On September 28, 2022, he initiated this action in the Superior Court of New Jersey.  He filed a Complaint against Borgata, MGM, BetMGM, and several affiliated or non-existent entities (collectively, "Defendants"), seeking to recoup his losses allegedly caused by "technical issues" he experienced while gambling on the Internet.  (*See* D.E. 1, ¶¶ 30-35).  Plaintiff alleged that he reported those issues to Defendants, and that instead of resolving the issues, Defendants offered him various incentives to drop his complaints and continue gambling.  (*Id.* at ¶¶ 38-44).  He claimed that those incentives amounted to "bribes" designed to take advantage of

Plaintiff's alleged problem gambling behavior.  (*Id.* at ¶ 49).  Plaintiff asserted

claims under the Consumer Fraud Act and the New Jersey Racketeer Influenced and

Corrupt Organization Act ("RICO"), as well as common law tort and contract

claims.  (*Id.* at ¶¶ 53-145).

On September 29, 2022, BetMGM removed the Complaint to the United

States District Court for the District of New Jersey.  (D.E. 1).  BetMGM filed a

motion to dismiss the Complaint.  (D.E. 23).  MGM and Borgata (the only other

defendants who were served) filed a separate motion to dismiss the Complaint.  (D.E.

24).  In the interim, Plaintiff was incarcerated, and both of his original lawyers

withdrew from representing him.  (D.E. 36, D.E. 41).  Plaintiff retained a new, third

counsel, who filed the Amended Complaint at issue in this appeal.  (D.E. 42, D.E.

47).

B.    The Amended Complaint.

The Amended Complaint took a different approach in attempting to recoup

Plaintiff's gambling losses.  The "technical issues" and RICO conspiracies that

formed the basis for Plaintiff's original Complaint are nowhere to be found.

Instead, Plaintiff now simply attributes financial losses to his problem

gambling.  (Plaintiff's Appendix Vol. 2 ("Pa2"), Amended Complaint ¶ 1).  He

alleges that Defendants were trained to recognize problem gambling behavior and

knew that he was a problem gambler.  (*Id.* at ¶¶ 3, 5).  According to the Amended

Complaint, Defendants designated Plaintiff as a "NOIR" VIP member, which gave him access to special incentives and direct contact with Defendants' employees. (*Id.* at ¶¶ 25, 27). Plaintiff alleges that after joining the NOIR VIP program, Defendants' employees offered Plaintiff various incentives to gamble, and communicated with him via email, telephone, and text message to encourage him to gamble. (*Id.* at ¶¶ 5, 8, 28). The Amended Complaint recites numerous alleged communications from Defendants' employees regarding these incentives. (*Id.* at ¶¶ 93-220).

Plaintiff does not allege that any of the incentives were deceptive or misleading. Instead, according to Plaintiff, Defendants' communications were intended to exacerbate his allegedly known problem gambling behavior. As a result, Plaintiff alleges that he placed a significant number of wagers with Defendants over several months. (*Id.* at ¶¶ 29, 223-27).

Plaintiff affirmatively alleges that Defendants complied with the Casino Control Act's requirements for problem gambling training—a statement with which BetMGM agrees. (*Id.* at ¶ 31). Yet he contends that Defendants' conduct caused him to suffer damages based on his gambling behavior from June 2019 to January 2020. (*Id.* at ¶ 227). Based on these allegations, Plaintiff asserted claims under the Consumer Fraud Act, as well as for common law negligence and unjust enrichment. (*Id.* at ¶¶ 228-46).

C.    The District Court's Dismissal Order.

On June 9, 2023, BetMGM filed a motion to dismiss the Amended Complaint. (D.E. 50). BetMGM argued that Plaintiff's claims were subject to a mandatory arbitration provision or, in the alternative, that Plaintiff's claims failed to state a claim on which relief can be granted. Borgata and MGM also filed a motion to dismiss raising similar arguments (as well as jurisdictional arguments inapplicable to BetMGM). (D.E. 51).

In a Letter Order dated January 31, 2024, the District Court granted Defendants' motions and dismissed Plaintiff's Amended Complaint. (D.E. 59; Pa1, pp. 9-16). The District Court recognized the weight of existing law, addressed the merits, and held that the Amended Complaint failed to state a claim for relief.

First, applying the New Jersey Supreme Court's test in *Lemelledo v. Ben. Mgmt. Corp. of Am.*, 150 N.J. 255, 264 (1997), the District Court concluded that Plaintiff's allegations involved highly regulated conduct that is exempt from the Consumer Fraud Act. The District Court recognized that Plaintiff's allegations involved "highly technical aspects of gambling, the resolution of which requires agency expertise." (Pa1, p.11 (citing favorably *Doug Grant, Inc. v. Greate Bay Casino Corp.,* 232 F.3d 173, 188-89 (3d Cir. 2000), and *Marcangelo v. Boardwalk Regency Corp.*, 847 F. Supp. 1222, 1224-25 (D.N.J. 1994) involving alleged violations of technical gambling regulations, and distinguishing *Bandler v. Landry's*

*Inc.*, 464 N.J. Super. 311, 321 (App. Div. 2020) as relating to alleged violations not unique to gaming)).  The court identified the numerous regulations aimed to address issues surrounding problem gambling.  (*Id.* at pp. 11-12).  The court found that one such regulation—N.J.A.C. § 13:69O-1.2(x)—was directly on point because it required specialized problem gambling training for casino employees "meant to follow specific standards promulgated by the Council on Compulsive Gambling of New Jersey." (*Id.* at p.12).

The District Court found that other regulations also dealt "specifically, concretely, and pervasively" with problem gambling.  (*Id.* (internal quotation marks omitted) (*citing* N.J.A.C. § 13:69A-9.4(c)(5)-(6), N.J.A.C. § 13:69O-1.2(j), N.J.A.C. § 13:69O-1.2(z), N.J.A.C. § 13:69O-1.9, and N.J.A.C. § 13:69G-2.2)).  As the court acknowledged, imposing Consumer Fraud Act liability would "certainly work at cross-purposes" with the Casino Control Act because a casino could be "liable for violations of the Consumer Fraud Act despite being 'in full compliance with the [Casino Control Act].'"  (*Id.* at pp. 12-13 (internal modifications and citations omitted)).  That concern was especially salient because, as the court observed, Plaintiff acknowledged that Defendants complied with the Casino Control Act regulations; yet he claimed they should nonetheless be liable under the Consumer Fraud Act.  (*Id.* at pp. 12-13 (citing Pa2, ¶ 31)).

14

<u>Second</u>, the District Court concluded that Defendants did not owe Plaintiff a duty of care. (*Id.* at pp. 13-15). The court acknowledged that no court in New Jersey has recognized such a duty. (*Id.* at p.13). And, referencing analogous case law and the "comprehensive regulatory framework at play" (*i.e.*, the Casino Control Act), the court declined to do so based on Plaintiff's allegations. (*Id.* at p.14). It reasoned that two federal court cases—*Taveras v. Resorts Int'l Hotel, Inc.*, No. 07-4555, 2008 WL 4372791 (D.N.J. Sept. 19, 2008), and this Court's decision in *Hakimoglu v. Trump Taj Mahal Assocs.*, 70 F.3d 291 (3d Cir. 1995)—were "directly on point." Both cases, as the court explained, declined to impose a tort duty on gaming operators despite "very similar" allegations of wrongdoing. (*Id.* at pp. 13-14). The District Court also reasoned that the New Jersey Legislature's decision not to impose a duty, despite its "pervasiv[e]" regulation of many other aspects of the relationship between casinos and problem gamblers, was compelling evidence against finding a duty of care based on Plaintiff's allegations. (*Id.* at p.14).

The District Court also rejected arguments nearly identical to the arguments Plaintiff raises on appeal.

<u>First</u>, it rejected the argument that a recent regulation relating to mandatory training in identifying problem gamblers (*i.e.*, N.J.A.C. § 13:69O-1.2(x)) favors the existence of a duty.

15

Second, the District Court rejected Plaintiff's argument that Defendants' alleged conduct is distinguishable from the conduct in *Taveras* and *Hakimoglu*. (*Id.* at p.15). The District Court observed that in *Taveras*, for example, the allegations involved affirmative acts—such as offering enticements and preventing the plaintiff's family members from removing her from a casino—and yet, that court still concluded the defendant had no common law duty of care. (*Id.*)

Third, the District Court rejected Plaintiff's argument that changes in how problem gambling is classified in the American Psychiatric Association's Diagnostic and Statistical Manual 5 ("DSM-5") supported the existence of a duty. The court explained that the classification of a condition in the DSM did not control the existence of a legal duty. And it observed that in *Hakimoglu*, this Court rejected the invitation to impose a duty despite alcohol dependence being classified as a substance addiction disorder in the DSM. (*Id.* at p.15).

## SUMMARY OF THE ARGUMENT

Plaintiff's opening brief attempts to raise seventeen "issues" for the Court's resolution. *See* Brief of Appellant, D.E. 19-1 ("Pl. Br."), pp. 6-9. However, that shotgun approach obfuscates the issues and fails to focus the Court on the two straightforward questions on appeal—*i.e.*, whether the District Court properly dismissed Plaintiff's Consumer Fraud Act claim, and whether the District Court

properly dismissed Plaintiff's negligence claim.   The answer to both questions is yes.

<u>First</u>, the District Court properly dismissed Plaintiff's Consumer Fraud Act claim based on a conflict with the Casino Control Act.  *See Lemelledo*, 150 N.J. at 268 (conduct is exempt from the Consumer Fraud Act when liability would lead to a "direct and unavoidable conflict" with another regulatory scheme).   The Casino Control Act and its multitude of regulations embody New Jersey's comprehensive scheme to regulate gambling within its borders.  *See Knight*, 86 N.J. at 381.  That framework specifically addresses issues surrounding problem gambling—mainly, by requiring gaming operators to educate the public about problem gambling resources, to adhere to an individual's desire to self-exclude from gambling, and, even as to non-excluded individuals, to monitor gambling activity for hallmarks of problem gambling.

But despite the Casino Control Act's pervasive regulations around problem gambling, none of those regulations even hint that the New Jersey Legislature intended to make gaming operators liable in court directly to individuals for their problem gambling.  In fact, all the regulations point in the opposite direction.  *See, e.g.,* N.J.A.C. § 13:69G-2.2(a), (d)(3)(ii)-(iv) (requiring self-exclusion application to include a waiver of liability against casinos for failing to withhold gaming privileges).  The Legislature has, instead, given the Division of Gaming Enforcement

significant tools to address a gaming operators' violation of the problem gambling regulations.

This regulatory scheme reflects a policy choice—effectuated only after careful deliberation by the elected Legislature and regulators with technical gaming expertise. That policy has been addressed and refined over almost fifty years. It should not be second-guessed through the expansion of Consumer Fraud Act liability. Plaintiff's Consumer Fraud Act claim would impose an entirely new scheme of liability to individual players that would be inconsistent with the Division of Gaming Enforcement's requirements—despite decades of law declining to impose such a scheme. Therefore, the District Court correctly held that Defendants' alleged conduct was exempt from Consumer Fraud Act scrutiny.

Plaintiff's arguments to the contrary all lack merit. The first nine of his seventeen purported appellate "issues" all reduce to one argument: that to exempt Defendants' conduct from the Consumer Fraud Act, there must be an affirmative regulation under the Casino Control Act with which Consumer Fraud Act liability would conflict; and that absent such an "actual conflict," his Consumer Fraud Act claim is viable. But that argument is incorrect. Technical gaming conduct (as alleged here) is exempt from the Consumer Fraud Act because the Legislature has occupied the topic with its all-encompassing regulations. It makes no difference, as Plaintiff contends, that the Casino Control Act does not specifically endorse or

prohibit the conduct Plaintiff alleges. As *Lemelledo* instructs, Plaintiff's Consumer Fraud Act claim must be dismissed because any other outcome would put gaming operators, like Defendants, in the untenable position of carefully following a pervasive regulatory scheme, only to find themselves engaging in unlawful conduct under the Consumer Fraud Act.

Second, the District Court properly dismissed Plaintiff's negligence claim based upon the lack of a legal duty to Plaintiff. The overwhelming weight of authority has reached the same conclusion—a gaming operator does not owe a duty of care to a problem gambler for their gambling losses.

A traditional duty analysis yields the same conclusion—one, the casino-patron relationship is unique because it involves providing patrons with entertainment in the form of gambling; two, a casino cannot reasonably exercise care to prevent direct financial harm to a problem gambler who insists on gambling, due to the insurmountable subjective factors inherent in identifying problem gamblers who have not self-excluded and in setting limits on their gambling; three, public policy embodied in the Casino Control Act does not favor judicially created direct financial liability between gaming operators and patrons that could conflict with the Division of Gaming Enforcement's requirements. Instead, gaming operators are subject to detailed regulations about educating, identifying and, when appropriate, excluding problem gamblers; and their failure to comply with those regulations may

result in penalties, restitution, and other relief by the Division of Gaming Enforcement.

Plaintiff's arguments to the contrary, reflected in "Issues" 10-16, fail to overcome the weight of authority and reasoned policy choices of New Jersey lawmakers. In fact, Plaintiff eschews any duty analysis altogether, and instead focuses on non-existent or trivial distinctions in the case law. At bottom, he has not carried his significant burden to explain why this Court should impose a common law duty where none has ever existed before.

## ARGUMENT

### 1.    Standard of Review

This Court exercises plenary review of an order granting a motion to dismiss and must apply the same standard as the District Court. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 206 (3d Cir. 2009). To do so, the Court "must accept all of the complaint's well-pleaded facts as true," and determine if the pleading states a "plausible claim for relief." *Id.* at 210-11 (*quoting Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). If a pleading fails "to state a claim upon which relief can be granted," it must be dismissed. *See* FED. R. CIV. P. 12(b)(6).

2.    **Defendants' Alleged Conduct Is Exempt from the Consumer Fraud Act.**

A.    Plaintiff's Consumer Fraud Act Claim Conflicts with the Casino
Control Act's Detailed Problem Gambling Regulations.

Plaintiff's Consumer Fraud Act claim fails to state a claim for relief because applying that statute to Defendants' alleged conduct would lead to a direct and unavoidable conflict with the Casino Control Act.

The Consumer Fraud Act is broad, remedial legislation.  To that end, the New Jersey Supreme Court has explained that "it should ordinarily be assumed that the [Consumer Fraud Act] applies to the covered practice." *Lemelledo*, 150 N.J. at 268.

And yet, the Consumer Fraud Act undoubtedly has limits.  *See Real v. Radir Wheels, Inc.*, 198 N.J. 511, 522 (2009) ("Although intentionally broad, the reach of the [Consumer Fraud Act] is not without boundaries.").  One important limit— rooted in the separation of powers doctrine—arises when imposing Consumer Fraud Act liability would lead to a "direct and unavoidable conflict" with another regulatory scheme.  *Lemelledo*, 150 N.J. at 264.

To find a "direct and unavoidable conflict," "the other source or sources of regulation [must] deal specifically, concretely, and pervasively with the particular activity, implying a legislative intent not to subject parties to multiple regulations that, as applied, will work at cross-purposes." *Id.* at 270.  The principle behind this rule is "the understanding that the Legislature does not intentionally subject regulated entities to clearly conflicting administrative regimes." *Id.* at 268.

When there is a direct and unavoidable conflict between the Consumer Fraud Act and another regulatory scheme, the conduct is exempt from the Consumer Fraud Act. *Id.*; *see also Daaleman v. Elizabethtown Gas Co.*, 77 N.J. 267, 268-69 (1978) (holding that an energy tariff that was set in allegedly fraudulent manner and passed on to customers was exempt from Consumer Fraud Act because the tariff was subject to pervasive regulation and expressly authorized under an administrative order).

As a result, conduct that is governed by the Casino Control Act is exempt from the Consumer Fraud Act. Such conduct is exempt because it is subject to "extraordinarily pervasive and intensive" regulation "cover[ing] virtually every facet of casino gambling and its potential impact upon the public." *Knight*, 86 N.J. at 381; *see Miller v. Zoby*, 250 N.J. Super. 568, 578 (App. Div. 1991) (stating, as of 1991, that "[t]he regulations now consume 15 chapters and a full volume of the administrative code"); Statement of the Case, Section 1, *supra*.

Courts have thus categorically rejected Consumer Fraud Act claims relating to issues within the Casino Control Act's framework. *See, e.g.*, *Doug Grant, Inc.*, 232 F.3d at 189 (affirming dismissal of RICO claim because blackjack card-counting countermeasures were lawful under Casino Control Act; affirming denial of leave to amend to add Consumer Fraud Act claim because it would interfere with Casino Control Act); *Marcangelo*, 847 F. Supp. at 1231-32 (D.N.J. 1994) (dismissing Consumer Fraud Act claim and refusing to find implied cause of action under Casino

Control Act for defective signage on a blackjack slot machine because the Casino Control Commission authorized the signage, and issue of gaming signage was entrusted to that agency); *In re Borgata Winter Poker Open*, A-4409-13T3, A-0231-14T3, 2016 WL 4072219, at *8 (N.J. Super. Ct. App. Div. Aug. 1, 2016) (affirming dismissal of Consumer Fraud Act claim because it was "subject of a detailed regulation governing the conduct of a casino licensee, that only the Division [of Gaming Enforcement] has the power to enforce"); *cf. Miller*, 250 N.J. Super. at 580 (affirming dismissal of claims relating to alleged unlawful extension of casino credit because there is no private right of action for violations of gaming regulations and holding otherwise would violate separation of powers doctrine).

Plaintiff's Consumer Fraud Act claim is no different because it relates to a technical aspect of gaming law governed by the Casino Control Act—*i.e.*, problem gambling.  To be clear, Plaintiff's Consumer Fraud Act claim is not about potentially non-technical casino advertising (*e.g.*, "Play and Win $100").  Instead, it relates to his problem gambling behavior—which is a nuanced and complex issue that the Legislature has entrusted entirely to the expertise of the Casino Control Commission and the Division of Gaming Enforcement.  In fact, Plaintiff concedes there are regulations governing problem gambling.  (Pa2, ¶ 30 ("Defendants were obligated by N.J.A.C. 13:69O- 1.2(x) to implement training for employees. . . on the recognition of the nature and symptoms of problem gambling behavior, and how to

assist players in obtaining information regarding help for a gambling problem.")). And he even concedes that BetMGM complied with those regulations. (*Id.* at ¶ 31 ("At all relevant times, Defendants were in full compliance with N.J.A.C. 13:69O-1.2(x).")).

The existence of numerous other regulations shows that the topic of problem gambling has been left to gaming regulators to promulgate regulations and penalize non-compliance. The Casino Control Act, for example, provides individuals a mechanism to self-exclude from gambling. N.J.A.C. § 13:69G-2.2(a). Gaming operators who violate a self-excluded player's wishes can be held responsible by the Division of Gaming Enforcement; but they are decidedly not held liable for the financial consequences to an individual self-excluded player. *Id.* § 13:69G-2.2(d). The District Court identified numerous other regulations relating to problem gambling, which "deal pervasively with the responsibilities of casinos as they relate to compulsive gambling." (Pa1, p.12).

In light of that pervasive regulation, it is not the Court's role to inject Consumer Fraud Act liability into the equation. As New Jersey courts have cautioned, "the Legislature intended that the casino industry be strictly 'regulated and controlled' [under the Casino Control Act] . . . and not by a creatively-spirited judiciary." *Miller*, 250 N.J. Super. at 578-79 (quoting N.J.S.A. § 5:12-1(13)). Indeed, the Casino Control Act provides a detailed roadmap for how gaming

operators must conduct business, including the numerous ways in which they must address problem gambling behavior.  *See, e.g.*, N.J.S.A. § 5:12-71.2(b) (requiring procedures to prevent self-excluded patrons from gambling); N.J.A.C. § 13:69O-1.2(x)(1)-(3) (requiring Internet gaming operators to train employees with direct patron contract in how to identify and respond to problem gambling behavior).  By contrast, the Consumer Fraud Act's prohibition of "unconscionable commercial practices" is intentionally vague.  *See, e.g., Gonzalez v. Wilshire Credit Corp.*, 207 N.J. 557, 576 (2011) ("[T]he [Consumer Fraud Act] does not attempt to enumerate every prohibited practice . . . .").  Imposing Consumer Fraud Act liability would therefore inject intolerable uncertainty into how gaming operators conduct business by exposing them to inconsistent standards under the Casino Control Act and Consumer Fraud Act.  It would also deprive regulators of the ability to be proactive in responding to changing conditions, by relegating problem gaming issues to case-by-case decisions rather than thoughtful, comprehensive regulation designed to address the problem on an industry-wide basis.

Yet, the crux of Plaintiff's Consumer Fraud Act claim is that Defendants engaged in an unlawful practice by allowing him to gamble despite allegedly knowing he was a problem gambler (even though Plaintiff is not on the self-exclusion list).  (*See, e.g.*, Pa2, ¶ 234).  As the District Court observed, the Consumer Fraud Act and Casino Control Act "would certainly work at cross-purposes" if the

Consumer Fraud Act imposed liability in an area that the Casino Control Act did

not. (*See* Pa1, p.12). Because the issue of problem gambling is within the Casino

Control Act's exclusive purview, and is the subject of detailed regulations, New

Jersey law simply does not recognize a Consumer Fraud Act claim for the conduct

Plaintiff alleges. Plaintiff's claim was, therefore, properly dismissed.

> **B.** **The District Court Correctly Applied Governing New Jersey Law and Held That Defendants' Alleged Conduct Was Exempt from the Consumer Fraud Act.**

Plaintiff argues that the District Court either failed to apply or misapplied the

*Lemelledo* test. Pl. Br., pp. 25-34. All of Plaintiff's arguments misread the District

Court's opinion, as well as the case law, and should be rejected.

First, Plaintiff argues that the District Court "failed to acknowledge" the

"presumption against preemption" of Consumer Fraud Act claims. *Id.* at p.25. That

argument is both incorrect and beside the point. It is incorrect because the District

Court acknowledged that "the [Consumer Fraud Act] applies to covered practices . .

. even in the face of other existing sources of regulation." *See* Pa1, p.13; *cf.*

*Lemelledo,* 150 N.J. at 268 ("[I]t should ordinarily be assumed that the [Consumer

Fraud Act] applies to the covered practice."). And it misses the point because the

presumption that the Consumer Fraud Act applies can be overcome when there is a

"direct and unavoidable conflict" with another source of regulation. *Lemelledo,* 150

N.J. at 264. Contrary to Plaintiff's argument, the District Court did not misapply

*Lemelledo*.  Rather, it held that *Lemelledo*'s test to determine a Consumer Fraud Act exemption was satisfied.  (*See* Pa1, p.12).

Second, Plaintiff argues that the District Court misapplied the *Lemelledo* test because it held Defendants' alleged conduct was exempt from the Consumer Fraud Act without a direct and unavoidable conflict or the need for agency expertise.  Pl. Br., pp. 27-32.  He cites *Bandler*, 464 N.J. Super. at 324, and *Smerling v. Harrah's Entertainment, Inc.*, 389 N.J. Super. 181, 184-85 (App. Div. 2006), which do not support his position.  In both cases, the Appellate Division held that non-technical casino advertising was subject to the Consumer Fraud Act.  *See Bandler*, 464 N.J. Super. at 315-17, 324 (finding advertisement for poker tournament with $150,000 in prize money could be deceptive and was not exempt from the Consumer Fraud Act); *Smerling*, 389 N.J. Super. at 192-93 (finding advertisement containing gambling incentives available on a certain date could be deceptive and was not exempt from the Consumer Fraud Act).  The facts in those cases did not involve "arcane or technical rules" of gaming, *Bandler*, 464 N.J. Super. at 324, so the Consumer Fraud Act and Casino Control Act did not point in different directions.

To be sure, there is a distinction between technical gaming conduct within the Casino Control Act's regulatory framework (which is exempt from Consumer Fraud Act scrutiny) and non-gaming conduct (which is not exempt from Consumer Fraud Act scrutiny).  *Compare Doug Grant, Inc*, 232 F.3d at 188 (card-counting

countermeasures would be exempt from the Consumer Fraud Act); *Marcangelo*, 847 F. Supp. at 1228-29 (blackjack slot machine winning combination signage would be exempt from common law fraud claims); and *Decker v. Bally's Grand Hotel Casino*, 280 N.J. Super. 217 (App. Div. 1994) (regulations for removing progressive slot machines from casino floors would be exempt from common law claims), *with Bandler*, 464 N.J. Super. at 324 (no special gaming regulations at issue when casino failed to pay out advertised prize), and *Smerling*, 389 N.J. Super. at 192-93 (no special gaming regulations at issue when casino failed to honor birthday coupon on the advertised date).

Plaintiff largely acknowledges this distinction, but then misapplies it. *See* Pl. Br., pp. 27-32. He argues, in effect, that the Casino Control Act must affirmatively endorse or prohibit a casino's conduct for it to be exempt from the Consumer Fraud Act. *See* Pl. Br., pp. 28-29. That is not the law. The point, instead, is that the Casino Control Act has pervasively regulated problem gambling, which is a nuanced and evolving issue delegated to New Jersey's gaming agencies. The regulations point in one direction (*e.g.*, requiring gaming operators to enforce a self-exclusion, collect information designed to identify problem gamblers, and provide information and resources to the public about problem gambling), while Plaintiff's Consumer Fraud Act claim would point in the opposite direction (*i.e.*, it would impose direct financial liability on casinos to problem gamblers for failing to prevent them from gambling).

*Cf. id.* at p.29 (conceding that BetMGM complied with the Casino Control Act's problem gambling regulations). That is the textbook case to exempt conduct from the Consumer Fraud Act.

Finally, Plaintiff argues that finding a Consumer Fraud Act exemption in this case impermissibly delegates exclusive jurisdiction over every aspect of casino regulation to the Casino Control Commission. *See* Pl. Br., pp. 32-34. For several reasons, that is wrong. One: this case only involves a Consumer Fraud Act exemption for Plaintiff's problem gambling allegations—not the entire casino industry. The Casino Control Act's regulations over problem gambling are comprehensive and express the Legislature's intent to entrust those issues to the New Jersey gaming regulators. Two: the doctrines of primary and exclusive jurisdiction are only in play when a defendant's compliance with another regulatory scheme is in dispute. *See Smerling*, 389 N.J. Super. at 192-93 (reversing trial court order based on exclusive jurisdiction where false advertising allegations were not subject to Casino Control Act regulations). Here, by contrast, Plaintiff concedes that the Casino Control Act regulates aspects of problem gambling—and he even concedes that Defendants complied with those regulations.[1]

---

[1] Plaintiff's concession on this issue is not controlling of the issues in this appeal. However, that concession underscores the reality that, not only does the Casino Control Act comprehensively regulate gaming operators in relation to problem

**3.    BetMGM Does Not Owe Plaintiff a Duty of Care.**

A.    Considerations of Fairness and Public Policy Belie the Existence of a Duty from BetMGM to Plaintiff.

Plaintiff fails to state a claim for negligence because BetMGM does not owe Plaintiff a common law duty of care.

The existence of a duty is a question of law. *See Hopkins v. Fox & Lazo Realtors*, 132 N.J. 426, 439 (1993) ("Determining the scope of tort liability has traditionally been the responsibility of the courts."). The court must balance considerations of public policy and fairness. *Id.* The New Jersey Supreme Court has identified four factors to guide the balancing analysis: "the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution." *Id.* That analysis is "very fact-specific and principled," and its outcome must fairly resolve the case at bar as well as provide "sensible rules to govern future conduct." *Id.*

Those factors yield one result: no duty exists here. When it comes to problem gambling, courts in New Jersey and around the country have repeatedly and consistently reached that result. *See Harrah's Atl. City Op. Co. v. Dangelico*, No. A-2158-17T3, 2019 WL 1869008, at *3 (N.J. Super. Ct. App. Div. Apr. 26, 2019) (declining to impose duty on casino to deny credit to alleged compulsive gambler);

---

gambling, but that Defendants have undertaken the significant steps required to comply with those regulations.

*Taveras*, 2008 WL 4372791, at *4 (holding that casino does not owe duty "to rescue compulsive gamblers from themselves" by stopping them from gambling); *cf. Harrah's Atl. City Op. Co.*, 2019 WL 1869008, at *3 (explaining that courts in other jurisdictions have likewise "declined to impose a duty on casinos to restrict the activities of compulsive gamblers" and citing *Merrill v. Trump Indiana, Inc.*, 320 F.3d 729, 733 (7th Cir. 2003), *Rahmani v. Resorts Int'l Hotel, Inc.*, 20 F. Supp. 2d 932, 937 (E.D. Va. 1998), *Duff v. Harrah South Shore Corp.*, 125 Cal. Rptr. 259, 260-61 (Ct. App. 1975), *Stevens v. MTR Gaming Grp., Inc.*, 788 S.E.2d 59, 66 (W. Va. 2016), and *Caesars Riverboat Casino, LLC v. Kephart*, 934 N.E.2d 1120, 1123 (Ind. 2010)).[2]

In this decades-long and unbroken line of cases, the same fairness and public interest considerations repeatedly weigh against the existence of a duty. *See Hopkins*, 132 N.J. at 439. <u>First</u>, the relationship between a casino and its patrons involves providing a lawful venue to enjoy the fun and entertainment of gaming. *See Harrah's Atl. City Op. Co.*, 2019 WL 1869008, at *2.

<u>Second</u>, a casino cannot reasonably exercise care to prevent direct financial harm to a problem gambler who insists on gambling. Numerous aspects of problem gambling are subjective—such as, for example, distinguishing problem gamblers

---

[2] Likewise, this Court has rejected the opportunity to impose a duty on casinos towards intoxicated gamblers for their financial losses. *See Hakimoglu*, 70 F.3d at 294.

from recreational gamblers and determining when gambling losses become "excessive." *See id.* at *3 (explaining difficulties of "distinguish[ing] compulsive gamblers from recreational gamblers" and "set[ting] reasonable limits on compulsive gamblers"); *Taveras*, 2008 WL 4372791, at *4 (analogizing imposing a duty on casinos to "a duty on shopping malls and credit-card companies to identify and exclude compulsive shoppers"). A regular gambler could claim they suffered problem gambling losses, and a gaming operator would have no ability to refute that assertion. That could, in turn, lead to a situation in which patrons have an incentive to gamble excessively, knowing they could recoup their losses through a "problem gambling" cause of action.

Third, the public interest weighs against imposing a judicially created duty because casinos are already subject to pervasive State regulation relating to problem gambling. *See id.* ("State law regulates virtually every facet of casino gambling and its potential impact upon the public. The regulatory scheme is both comprehensive and minutely elaborate."); *Harrah's Atl. City Op. Co.*, 2019 WL 1869008, at *3 (explaining it was "mindful that [New Jersey] has provided mechanisms for compulsive gamblers to protect themselves from their compulsion"); *Hakimoglu*, 70 F.3d at 293 (explaining that "intense state regulation of casinos" was an important factor in deciding that no duty exists).

New Jersey's policy, embodied in the Casino Control Act and its regulations, is to provide problem gamblers with resources to learn about, and obtain treatment for, problem gambling. The law also provides problem gamblers with a mechanism to self-exclude from gaming. Gaming operators, for their part, must implement training for their employees in identifying problem gambling, and must implement reasonable policies to prevent self-excluded players from gambling. But New Jersey law does not recognize a direct financial claim between a problem gambler and a gaming operator for gambling losses. A gaming operator's immunity from financial liability to a patron who gambles despite self-excluding under N.J.A.C. § 13:69G-2.2 underscores that tort principles play no part in determining liability for a problem gambler's losses.

Imposing a duty would undermine New Jersey's public policy in other ways, as well. One: doing so would usurp the Legislature's decision not to impose a duty for direct financial liability despite decades of gaming regulation—instead, it has imposed significant duties on gaming operators while entrusting enforcement to the regulators. *Cf. Hakimoglu v. Trump Taj Mahal Assocs.*, 876 F. Supp. 625, 637 (D.N.J. 1994), *aff'd*, 70 F.3d at 291 (3d Cir. 1995) ("It seems rather remarkable that the regulating authorities would be so silent for so long if they believed casinos should have such a duty.").

Two: the financial consequences to casinos could be disastrous. *See Taveras*, 2008 WL 4372791, at *4 (explaining that imposing such a duty would "have no limit" and would "sacrifice common sense"). As explained, imposing a duty would create "difficult problems of proof and causation," *see Hakimoglu*, 70 F.3d at 294, such as distinguishing "regular" losses from "excessive" losses, (which, unlike issues such as blood-to-alcohol concentrations, is inherently subjective). Moreover, all players have the same opportunity to win or lose, making it impossible to calculate losses "due to problem gambling." As a result, imposing a duty means that gaming operators would face uncertain liabilities, potentially years after the fact, which they would be unable to refute. *See id.* (noting that dram shop claim for gambling losses "could be fabricated with greater ease than a dram-shop action involving personal injury"). Moreover, imposing a vague tort duty would undermine the Casino Control Act's sophisticated regulatory scheme, in which gaming operators are subject to strict guidelines and are subject to regulatory penalties if they fail to comply.

The District Court's Letter Order embodies these considerations and properly held that BetMGM does not owe Plaintiff a common law duty of care. (Pa1, pp. 13-14). This Court should affirm.

B.    This Court Should Not Impose a Novel Duty of Care on Casinos.

Plaintiff nonetheless asks this Court to upend decades of case law and regulation to impose a duty of care where none has ever existed, and that the legislature has never required. It should decline to do so.

Principally, Plaintiff fails to show any reason why the Court should take that leap of faith. He does not meaningfully analyze any of the New Jersey Supreme Court's factors to determine the existence of a duty. *See generally* Pl. Br., pp. 34-41. Nor does he cite any case law (from New Jersey or elsewhere) to support the existence of the duty he seeks to impose here. His argument is, at best, a tautological one. *See id.* at p.40 (arguing that a tort duty "would merely follow the same standard for tort duty applied to any other New Jersey business under its negligence laws."). That is not enough to create a duty of care that the law has never recognized.

Instead, Plaintiff simply challenges the continued vitality of *Hakimoglu* and *Taveras*, hoping this Court will reach a different result. *See id.* at pp. 35-41. First, Plaintiff argues that *Hakimoglu* is not controlling because it was a dram shop liability case. *See id.* at p.36. To be sure, this is not a dram shop case. However, other courts considering the duties between a casino and a problem gambler have drawn that analogy. *See, e.g.*, *Merrill*, 320 F.3d at 732-33 (addressing "whether casinos can be sued in tort when they fail to evict a gambler who requests his own exclusion" and concluding "[t]he closest analogy . . . is that of a tavern's liability to exercise

reasonable care to protect its patrons"). Plaintiff even alleges that alcohol use disorders and gambling disorders have much in common. *See* Pl. Br., p.40. Ultimately, what matters is that *Hakimoglu* identified many of the same concerns that reject finding a duty here—namely, the pervasive regulation over every aspect of casinos, and the "difficult problems of proof and causation" that would upset those regulations. *Hakimoglu*, 70 F.3d at 294.

Second, Plaintiff argues that *Hakimoglu* is no longer good law because *Bandler* and *Smerling* allowed parties to assert common law claims against a casino. Pl. Br., pp. 36-37. But those cases merely determined that **some** common law claims may be pled against a casino on **some** facts. They did not address, much less decide, whether a gaming operator owes a duty to stop problem gamblers from gambling. And contrary to Plaintiff's argument, New Jersey case law after *Hakimoglu* has reinforced, not undermined, its reasoning as applied to compulsive gambling. *See, e.g.*, *Harrah's Atl. City Op. Co.*, 2019 WL 1869008, at **2-3 (finding no duty to deny credit to compulsive gambler).

Third, Plaintiff attempts to distinguish *Taveras* because it purportedly involved a "passive casino" that failed to stop a problem gambler from gambling. Pl. Br., p.37. That is not so. The plaintiff in *Taveras* alleged that the casino fueled her gambling addiction by enticing her with promotions and free "limousine rides, hotel rooms, food, entertainment, and gift coupons." *Taveras*, 2008 WL 4372791,

at *2.  She also alleged that the casino stopped her family members from removing her from the casino to prevent her from gambling.  *Id.* at *1.  Those allegations can hardly be characterized as "passive," as Plaintiff contends.  The District Court found that the allegations in *Taveras* were "no different" from the "affirmative enticements" Plaintiff alleged in the Amended Complaint and correctly concluded there was no duty of care.  (Pa1, p.15).

Fourth, Plaintiff contends that N.J.A.C. § 13:69O-1.2(x), which was enacted after *Taveras*, means that casinos can now identify problem gamblers and foresee the risk of self-harm problem gamblers may inflict.  Pl. Br., p.38.  But N.J.A.C. § 13:69O-1.2(x) does not change the calculus.  That regulation requires casinos to train certain employees to recognize problem gamblers and direct them to resources about problem gambling.  Gaming operators—including BetMGM—take this responsibility very seriously and implement significant internal controls relating to problem gambling.  But the regulation does not require gaming operators to pay a player for losses incurred due to alleged problem gambling.

Fifth, Plaintiff argues, in effect, that "times have changed" since *Taveras* because problem gambling was classified as a "Substance-Related and Addictive Disorder" in the DSM-V.  *See* Pl. Br., pp. 38-39.  That classification has nothing to do with the existence of a legal duty of care, and Plaintiff cites no authority for why it should.  To the contrary—despite that classification, the New Jersey Legislature

has not imposed a duty of care on casinos to problem gamblers. And as the District Court observed, although such a classification would place problem gambling alongside alcohol disorders, *see id.* at p.40, this Court in *Hakimoglu* "refused to extend common law dram shop liability . . . to casino gambling losses." (Pa1, p.15).

## CONCLUSION

The District Court correctly applied New Jersey law and dismissed Plaintiff's Consumer Fraud Act and common law claims. Plaintiff's alleged facts and arguments do not provide any basis to change the existing and carefully constructed precedent. Based on the foregoing, the District Court's Order should be affirmed.

Dated: July 25, 2024                    Respectfully submitted,

                                        *s/ Stephen M. Orlofsky*

                                        **BLANK ROME LLP**
                                        *A Pennsylvania LLP*
                                        Stephen M. Orlofsky
                                        New Jersey Resident Partner
                                        Daniel E. Rhynhart
                                        Lauren E. O'Donnell
                                        Michael R. Darbee
                                        300 Carnegie Center, Suite 220
                                        Princeton, NJ 08540
                                        Telephone: (609) 750-7700
                                        Stephen.Orlofsky@BlankRome.com
                                        Dan.Rhynhart@BlankRome.com
                                        Lauren.Odonnell@BlankRome.com
                                        Michael.Darbee@BlankRome.com
                                        *Attorneys for Defendant-Appellee*
                                        *BetMGM, LLC*

## CERTIFICATION OF BAR MEMBERSHIP

I, Stephen M. Orlofsky, Esq., certify that I am a member in good standing of the Bar of the United States Court of Appeals for the Third Circuit. Daniel E. Rhynhart, Esq., Lauren E. O'Donnell, Esq., and Michael R. Darbee, Esq., are also members in good standing of the Bar of the United States Court of Appeals for the Third Circuit.


Dated: July 25, 2024          *s/ Stephen M. Orlofsky*
                              STEPHEN M. ORLOFSKY

## CERTIFICATION OF WORD COUNT AND TYPEFACE

I, Stephen M. Orlofsky, Esq., certify that Defendant-Appellee BetMGM, LLC's Brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B), as this brief contains 8,515 words, according to the word processor word count, excluding the parts exempted by FED. R. APP. P. 32(f).

The brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft Office 365, Version 2405, Build 17628.20188, in 14-point Times New Roman font.

Dated: July 25, 2024                     *s/ Stephen M. Orlofsky*
                                          STEPHEN M. ORLOFSKY

## **CERTIFICATION OF IDENTICAL COMPLIANCE OF BRIEFS**

I, Stephen M. Orlofsky, Esq., certify that Defendant-Appellee BetMGM, LLC's Brief as filed electronically, is identical to the hard copies filed or to be filed with the Clerk's Office.


Dated: July 25, 2024                  *s/ Stephen M. Orlofsky*
                                      STEPHEN M. ORLOFSKY

## <u>CERTIFICATION OF VIRUS CHECK</u>

I, Stephen M. Orlofsky, Esq., certify that Defendant-Appellee BetMGM, LLC's Brief as filed electronically, was scanned for computer viruses by using Microsoft Defender and that no virus was detected.

Dated: July 25, 2024 _s/ Stephen M. Orlofsky_
STEPHEN M. ORLOFSKY

## CERTIFICATION OF SERVICE

I, Stephen M. Orlofsky, Esq., certify that on July 25, 2024, I caused a copy of Defendant-Appellee BetMGM, LLC's Brief to be filed with the Clerk's Office for the United States Court of Appeals for the Third Circuit and served on all counsel of record via the Court's CM/ECF system.

I further certify that on July 25, 2024, I caused seven (7) copies of Defendant-Appellee BetMGM, LLC's Brief to be served by Federal Express overnight delivery as follows:

> Office of the Clerk
> United States Court of Appeals for the Third Circuit
> 21400 U.S. Courthouse
> 601 Market Street
> Philadelphia, PA 19106-1790

Dated: July 25, 2024                    *s/ Stephen M. Orlofsky*
                                        STEPHEN M. ORLOFSKY