# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT
Case No. 24-1364

SAM A. ANTAR,

*Plaintiff-Appellant*,

v.

THE BORGATA HOTEL CASINO AND SPA, LLC; B ONLINE CASINO; BETMGM, LLC; MGM RESORTS INTERNATIONAL, INC.; ENTAIN PLC; JOHN DOES 1-10; MARY DOES 1-10; AND XYZ CORPORATIONS 1-10,

*Defendants-Appellees.*

ON APPEAL FROM THE ORDER DATED JANUARY 31, 2024 OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY AT DOCKET NO. 22-05785 DISMISSING PLAINTIFF'S CLAIMS IN THEIR ENTIRETY FOR FAILURE TO STATE A CLAIM
THE HONORABLE MADELINE COX ARLEO, U.S.D.J.

## BRIEF OF PROPOSED AMICI CURIAE NEW JERSEY BUSINESS & INDUSTRY ASSOCIATION, NEW JERSEY CHAMBER OF COMMERCE AND COMMERCE AND INDUSTRY ASSOCIATION OF NEW JERSEY IN SUPPORT OF DEFENDANT-APPELLEE BETMGM, LLC

**McCARTER & ENGLISH, LLP**
David R. Kott, Esq. - NJ Attorney ID # 018131977
Edward J. Fanning, Jr., Esq. – NJ Attorney ID # 55351994
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
Telephone: (973) 622-4444
dkott@mccarter.com
efanning@mccarter.com
Attorneys for Proposed Amici Curiae
  *New Jersey Business & Industry
  Association, New Jersey Chamber of
  Commerce and Commerce and Industry
  Association of New Jersey*

## CORPORATE DISCLOSURE STATEMENT
## AND STATEMENT OF FINANCIAL INTEREST

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, the New Jersey Business & Industry Association, New Jersey Chamber of Commerce and Commerce and Industry Association of New Jersey makes the following disclosure:

1)    For non-governmental corporate parties please list all parent corporations:

    NONE

2)    For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

    NONE

3)    If there is a publicly held corporation which is not a party to the proceeding before this Court but which has a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

    NONE

4)    In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: (i) the debtor, if not identified in the case caption, (ii) the members of the creditors' committee or the top 20 unsecured creditors; and (iii) any entity not named in the caption which is an active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by the appellant.

    NOT APPLICABLE

Dated:  July 30, 2024                    */s/ David R. Kott*

                                        David R. Kott

# TABLE OF CONTENTS

**Page**

IDENTITY OF AMICI CURIAE AND INTEREST IN CASE ......................... 1

RULE 29(c)(5) STATEMENT ........................................................... 3

SUMMARY OF ARGUMENT ........................................................... 4

ARGUMENT

    I.    THE PLAIN LANGUAGE OF THE CASINO CONTROL ACT
        DEMONSTRATES THAT THE LEGISLATURE INTENDED
        FOR THE CASINO CONTROL COMMISSION AND THE
        DIVISION OF GAMING ENFORCEMENT TO EXCLUSIVELY
        REGULATE COMPULSIVE GAMBLING ...................................... 6

    II.   THE CASINO CONTROL ACT DEMONSTRATES THAT
        THE LEGISLATURE INTENDED FOR SPECIALIZED
        OVERSIGHT OF THE CASINO INDUSTRY ............................... 10

    III.  APPLYING THE CFA TO PLAINTIFF-APPELLANT'S
        CLAIM COULD CREATE INCONSISTENCIES AND
        DISRUPT THE UNIFORM REGULATORY ENVIRONMENT
        INTENDED BY THE LEGISLATURE .......................................... 12

CONCLUSION .............................................................................. 18

ME1 49172536v.1

## TABLE OF AUTHORITIES

**Page**

**Cases**

Doug Grant v. Greate Bay Casino Corp.,
  232 F.3d 173 (3d Cir. 2000) ...................................................10, 11, 12

Greate Bay Hotel & Casino v. Tose,
  34 F.3d 1227 (3d Cir. 1994) ....................................................7, 12, 17

J.B. Hunt Transp., Inc. v. USF Distribution Servs.,
  83 F. App'x 476 (3d Cir. 2003)..........................................................6

Lemelledo v. Beneficial Mgmt. Corp. of Am.,
  150 N.J. 255 (1997) ...........................................................................17

Marcangelo v. Boardwalk,
  47 F.3d 88 (3d Cir. 1995) ..................................................................10

MRL Dev. I, LLC v. Whitecap Inv. Corp.,
  823 F.3d 195 (3d Cir. 2016) ................................................................6

Richardson v. Standard Guar. Ins. Co.,
  371 N.J. Super. 449 (App. Div. 2004)...............................................16

Rosenberg v. XM Ventures,
  274 F.3d 137 (3d Cir. 2001) ................................................................6

**Statutes**

CASINO CONTROL ACT ..............................................................*passim*

CONSUMER FRAUD ACT .............................................................*passim*

N.J.S.A. 5:12-1.....................................................................................11

N.J.S.A. 5:12-1(a)-(b)(12) .....................................................................7

N.J.S.A. 5:12-1(b)(12) ...........................................................................7

N.J.S.A. 5:12-1(b)(13) .....................................................................7, 14

ME1 49172536v.1

N.J.S.A. 5:12-1(b)(13), -63 to -79 ............................................................8

N.J.S.A. 5:12-70 .......................................................................................9

N.J.S.A. 5:12-71.2(a)-(b) .........................................................................9

N.J.S.A. 5:12-71.2(a)-(b), -76.1(a), (b)(5), (b)(6) ................................17

N.J.S.A. 5:12-76.1(a), (b)(5), (b)(6) .....................................................10

N.J.S.A. 5:12-129–30 .............................................................................16

N.J.S.A. 17:16F-44, 48:3-84 .................................................................16

N.J.S.A. 56:8-19 ................................................................................13, 14

N.J.S.A. 56:8-59 .....................................................................................12

**Other Authorities**

Atlantic City Casino Industry Impact Report 2023, ATL. CITY
    COUNCIL (2023), https://online.fliphtml5.com/ivrx/yyjs/#p=1 .........................15

## **IDENTITY OF *AMICI CURIAE* AND INTEREST IN CASE**

Proposed amici curiae the New Jersey Business & Industry Association ("NJBIA"), New Jersey Chamber of Commerce ("NJ Chamber") and Commerce and Industry Association of New Jersey ("CIANJ") hereby submits this Amicus brief pursuant to Rule 29(b) of the Federal Rules of Appellate Procedure. All parties to this appeal have graciously consented to the filing of this Amicus brief by NJBIA, NJ Chamber and CIANJ.

NJBIA is New Jersey's largest statewide business association, representing member companies in all industries and regions of our State. Its mission is to provide information, services, and advocacy for its member companies and build a more prosperous New Jersey. NJBIA's members include most of the top 100 employers in the State, as well as thousands of small to medium-sized employers, from every sector of New Jersey's economy. One of NJBIA's goals is to reduce the costs of doing business in New Jersey, including unwarranted litigation burdens, in an effort to promote economic growth and benefit all of New Jersey. See New Jersey Business & Industry Association, About Us, http://www.njbia.org/ JoinNJBIA/About.aspx. NJBIA has been granted leave to appear as Amicus Curiae in numerous cases before this Court.

NJ Chamber is an advocacy organization for business that actively supports legislation and regulation that will lead to economic growth, an improvement in the

State's business climate and job creation.  Members of NJ Chamber are comprised of every industry that does business in the State, and include some of New Jersey's most prestigious and innovative companies.  See New Jersey Chamber of Commerce, About the New Jersey Chamber of Commerce, https://njchamber.com/about.  NJ Chamber's members range from very small businesses to large companies from every sector of New Jersey's economy.

NJ Chamber has a strong interest in this case based on its activities in promoting and maintaining New Jersey as an attractive location for businesses, including out-of-state companies considering New Jersey as a location to conduct business.  Accordingly, it is critical that statutes, including the CFA, be construed unambiguously and consistent with their intended scope, particularly because uncertainty is a significant obstacle to businesses entering and operating in this State.

Since its founding in 1927, CIANJ has been dedicated to leading free enterprise advocacy to provide an economic climate that fosters business potential through education, legislative vigilance and membership interaction.  CIANJ's primary objective is to make New Jersey a better place to live, work, and do business.  CIANJ's nearly 1,000 members range from Fortune 100 companies to sole proprietors representing a variety of enterprises and industries.  See

ME1 49172536v.1

Commerce and Industry Association of New Jersey, <u>About Us</u>, <u>http://www.cianj.org/about-us/</u>.

The proposed amici curiae respectfully submit that the issue raised in this case is of significant interest to the New Jersey business community. The issue of whether New Jersey's Consumer Fraud Act can apply to a New Jersey industry, including the casino industry, that the Legislature has determined should be heavily regulated by a New Jersey administrative agency, is a significant issue to the New Jersey business community.

NJBIA, NJ Chamber, and CIANJ believe they can provide a broader perspective on this issue than the Parties can offer. NJBIA, NJ Chamber, and CIANJ have a special interest and expertise regarding issues concerning the business community and can speak to many of the Legislature's policy considerations when it drafts legislation affecting New Jersey businesses. The proposed amici curiae are particularly well-suited to provide this Court with guidance on the important issue this Court will consider – one of substantial public importance to the New Jersey casino industry and indeed to all New Jersey businesses, including the members of NJBIA, NJ Chamber, and CIANJ.

## **RULE 29(c)(5) STATEMENT**

Pursuant to Rule 29(c)(5), NJBIA, NJ Chamber and CIANJ state as follows: (a) No party's counsel authored this brief in whole or in part; (b) no party or

ME1 49172536v.1

party's counsel contributed money that was intended to fund preparing or submitting this brief; and (c) no person outside of the NJDA contributed money intended to fund preparing or submitting this brief.

## SUMMARY OF ARGUMENT

In 1976 New Jersey voters passed a referendum to legalize casino gambling in Atlantic City, New Jersey. In 1977 the New Jersey Legislature enacted the Casino Control Act (the "CCA").

In the CCA, the Legislature expressly set forth its intent in enacting the CCA, setting forth 3 goals for casino gambling: (1) the rehabilitation and redevelopment of Atlantic City (which by definition included the creation of a significant number of jobs in the casino industry and the generation of significant taxes for the State of New Jersey and Atlantic City); (2) that there be regulation of the casino industry that inspires confidence and trust in the integrity of the casino industry; and (3) that the regulation of the casino industry would also include protection of persons who might develop an addiction to gambling.

To effectuate these goals, the Casino Control Commission ("CCC" or "Commission") has established a Division of Gaming Enforcement (the "DGE"). The CCC and DGE regulate virtually every aspect of casino operations. Indeed the Commission and the DGE have enacted comprehensive regulations that regulate and oversee every aspect of casino gambling.

ME1 49172536v.1

As set forth below, it is plain that the Legislature never intended the New Jersey Consumer Fraud Act (the "CFA") to apply to any aspect of casino gambling. Under the CFA, New Jersey's Division of Consumer Affairs can bring an action against a New Jersey business that violates the CFA. Hence, if the CFA applies to casino gambling, it would mean that casino gambling would be regulated by both the Division of Consumer Affairs and the DGE. However, the Legislature was clear that it wanted casino gambling to be regulated by the Casino Control Commission (and its DGE).

Moreover, under the CFA a prevailing plaintiff is entitled to treble damages and counsel fees. These damages are surely inconsistent with one of the Legislature's primary goals in enacting the Act – the economic revitalization of Atlantic City and the resulting generation of substantial taxes for the State of New Jersey and for Atlantic City.

In sum, it is plain that the Legislature intended that the type of conduct the Plaintiff-Appellant in this case complains of would be regulated only by the CCA and the DGE, and that it never intended that the CFA would apply in this case.

**<u>ARGUMENT</u>**

**I.    THE PLAIN LANGUAGE OF THE CASINO CONTROL ACT
       DEMONSTRATES THAT THE LEGISLATURE INTENDED
       FOR THE CASINO CONTROL COMMISSION AND
       THE DIVISION OF GAMING ENFORCEMENT
       <u>TO EXCLUSIVELY REGULATE COMPULSIVE GAMBLING</u>**

This Court has consistently held that "[w]hen interpreting a statute, [it] must give effect to the legislature's intent." <u>MRL Dev. I, LLC v. Whitecap Inv. Corp.</u>, 823 F.3d 195, 204 (3d Cir. 2016). "The clearest indication of that intent is always the statute's plain language." <u>J.B. Hunt Transp., Inc. v. USF Distribution Servs.</u>, 83 F. App'x 476, 479 (3d Cir. 2003). "Where the statutory language is plain and unambiguous, further inquiry is not required." <u>Rosenberg v. XM Ventures</u>, 274 F.3d 137, 141 (3d Cir. 2001).

The Casino Control Act, N.J.S.A. 5:12-1 et seq., begins with a clear statement establishing itself as the exclusive framework for regulating and controlling New Jersey's casino industry:

> It is in the public interest that the institution of licensed casino establishments in New Jersey <u>be strictly regulated</u> and controlled pursuant to the above findings and pursuant to the provisions of this act, which provisions are designed to engender and <u>maintain public confidence</u> and trust in the regulation of the licensed enterprises, to provide an effective method of rebuilding and redeveloping existing facilities and of <u>encouraging new capital investment in Atlantic City</u>, and to provide a meaningful and permanent contribution to the economic viability of the resort, convention, and tourist industry of New Jersey.

6

[N.J.S.A. 5:12-1(b)(13)]

If the Legislature had intended for the CFA to apply to compulsive gambling, it would not have limited regulation and control of the casino industry "to the provisions **of this act**" and its "findings" in N.J.S.A. 5:12-1(a)-(b)(12).  As this Court noted in Campione v. Adamar of New Jersey, Inc., the CCA's "statutory and regulatory controls cover virtually every facet of casino gambling and its potential impact upon the public."  155 N.J. 245, 256 (1998) (emphasis added).

The Legislature's "findings" in N.J.S.A. 5:12-1(a)-(b)(12) articulate the public policy goals of the act, which are to maintain public confidence in State oversight while enabling casinos to operate and contribute significantly to the State's economy.  Id.; Greate Bay Hotel & Casino v. Tose, 34 F.3d 1227, 1234 (3d Cir. 1994) ("Clearly, the policy expressed in section 5:12-1(b)(6) is a vital part of the Act, as the New Jersey Legislature 'took considerable pains to determine and expound the State's public policy involving casino gambling' and its potential impact upon the public.") (quoting Knight v. City of Margate, 431 A.2d 833, 836 (N.J. 1981)).  Furthermore, "'the public confidence and trust in the credibility and integrity of the regulatory process and of casino operations' is at the very heart of the public policy embraced by the … law." Id. (quoting N.J.S.A 5:12-1(b)(6)).

The regulatory and investigative powers and duties conferred by the Act are necessary to further its public policy goals.   See N.J.S.A. 5:12-1(b)(12).   In

7

Articles 4 and 5, the Legislature "created a two-tiered regulatory system in which the CCC exercises quasi-legislative and quasi-judicial power … and the DGE conducts investigations and prosecutions."  Campione, supra, 155 N.J. at 256 (citing N.J.S.A. 5:12-6).  The Legislature entrusted these agencies with several responsibilities including enforcement of regulations, rulemaking, investigations, licensing, and monitoring to ensure integrity and public trust in the State's casino industry and its regulation.  N.J.S.A. 5:12-1(b)(13), -63 to -79.

Specifically, Article 4 grants the DGE the authority to govern gaming-related advertising by prohibiting deceptive practices and requiring that gaming advertisements properly caution gamblers on compulsive gambling:

> The division shall, without limitation include the following specific provisions in its regulations in accordance with the provisions of this act:
>
> …
>
> (16) Governing the gaming-related advertising of casino licensees, their employees and agents, with the view toward assuring that such advertisements are in no way deceptive; provided, however, that such regulations shall require the words "Bet with your head, not over it," or some comparable language approved by the division, to appear on all billboards, signs, and other on-site advertising of a casino operation and shall require the words "If you or someone you know has a gambling problem and wants help, call 1-800 GAMBLER," or some comparable language approved by the division, which language shall include the words "gambling problem" and "call 1-800 GAMBLER," to appear legibly on all print, billboard, and sign advertising of a casino operation;

[N.J.S.A. 5:12-70]

This provision clearly demonstrates that the Legislature explicitly addressed the issue of gaming-related advertising and compulsive gambling by making "**the division**," i.e., the DGE, responsible for ensuring casino advertisements adhere to warning requirements in order to prevent casinos from engaging in conduct to entice compulsive gamblers – which is the crux of plaintiff's claim. Additionally, Article 4 provides that:

> The division shall provide by regulation for the establishment of a list of persons self-excluded from gaming activities at all licensed casinos and simulcasting facilities… and shall require licensed casinos and simulcasting facilities to establish procedures designed, at a minimum, to remove self-excluded persons from targeted mailings or other forms of advertising or promotions and deny self-excluded persons access to credit, complimentaries, check cashing privileges club programs, and other similar benefits.

> N.J.S.A. 5:12-71.2(a)-(b).

This provision indicates the Legislature's targeted approach to managing compulsive gambling by mandating the DGE to require casinos to establish procedures to prevent compulsive gamblers from receiving targeted advertisements and accessing casino-related privileges. Furthermore, Article 5 of the Act provides that:

> a. The Director of the Division of Gaming Enforcement, in consultation with the Casino Control Commission, shall establish an Internet gambling public awareness

campaign in order to promote awareness among the general public of issues relating to Internet gambling.

b. The public awareness campaign shall include…but not limited to, the following subjects:

…

(5) special risks for underage and problem gamblers when gambling on the Internet; and

(6) access to services for problem gamblers, including contact information for the Council on Compulsive Gambling.

N.J.S.A. 5:12-76.1(a), (b)(5), (b)(6).

The DGE's public awareness campaign underscores the Legislature's intent to address compulsive gambling through education and awareness, focusing on the unique risks associated with internet gambling, which is the conduct underlying Plaintiff-Appellant's claim.  App.'s Brief, ECF 19-1, at 13.

## II.    THE CASINO CONTROL ACT DEMONSTRATES THAT THE LEGISLATURE INTENDED FOR SPECIALIZED OVERSIGHT OF THE CASINO INDUSTRY

The text of the CCA clearly indicates that the Legislature specifically intended for the CCC and DGE to exclusively oversee the casino industry due to their agency expertise in resolving issues related to the highly sophisticated or technical aspects of gambling.  See Doug Grant v. Greate Bay Casino Corp., 232 F.3d 173, 188–89 (3d Cir. 2000) (CCA exclusively governs advertising that references specific aspects and rules of blackjack); see also Marcangelo v.

Boardwalk, 47 F.3d 88, 89, 91 (3d Cir. 1995) (plaintiff's suit preempted by CCA because slot machine signage referenced specific rule of the game).

Recognizing tourism's significant economic contribution, the Legislature aimed to restore Atlantic City as a major hospitality center through casino gambling, leading to the enactment of the CCA in 1976.  N.J.S.A. 5:12-1.  The Legislature was careful in its construction of the statute in order to address the complexities of casino gambling, balancing public protection against the State's economic interest in legalized gambling.  As noted in Doug Grant, "the goals of the Consumer Fraud and the Casino Control Acts are not entirely consistent.  The [CFA] is concerned with the protection of consumers.  The [CCA], however, has dual purposes that must be balanced – the protection of gambling patrons and the protection of the financial viability of the casino industry."  232 F.3d at 189 (citing N.J.S.A. 5:12-1b (12) (West 1996)).  To fulfill this dual purpose, the Legislature mandated specialized oversight by the CCC and DGE.

Furthermore, the Legislature understood that effectively preventing and treating compulsive gambling, without eliminating casino gambling entirely, requires specialized knowledge and continuous monitoring.  The creation of the CCC and DGE, equipped with this expertise and tasked with such monitoring, clearly indicates that the Legislature intended for these agencies to have exclusive oversight of compulsive gambling issues.  This is supported by cases such as

Greate Bay Hotel, where this Court affirmed the DGE's role in enforcing regulations, such as prohibiting casinos from allowing visibly intoxicated patrons to gamble. 34 F.3d at 1232–33. By entrusting the CCC and DGE with these responsibilities, the Legislature ensured that the complexities of the casino industry would be managed by experts who can effectively protect both the public and the industry's financial health.

### III. APPLYING THE CFA TO PLAINTIFF-APPELLANT'S CLAIM COULD CREATE INCONSISTENCIES AND DISRUPT THE UNIFORM REGULATORY ENVIRONMENT INTENDED BY THE LEGISLATURE

New Jersey law is well-settled that "the [CFA] does not apply to a heavily regulated industry to the extent that application of the statute would create a 'real possibility' of conflict between the [CFA] … and the regulatory schemes of other administrative bodies." Doug Grant, supra, 232 F.3d at 188 (citing Lemelledo v. Beneficial Mgmt. Corp. of Am., 150 N.J. 255, 270 (1997)). Under the CFA, not only can a consumer bring an action for money damages, but the New Jersey Division of Consumer Affairs ("DCA") can enact regulations under the CFA governing consumer issues. N.J.S.A. 56:8-59.

Daaleman v. Elizabethtown Gas Co. illustrates the conflict of dual regulation. 77 N.J. 267, 271–72 (1978). In Daaleman, the NJ Supreme Court reasoned that allowing plaintiff to recover under the CFA would imply that the DCA could regulate public utilities because the CFA permits the DCA to control

12

selling and advertising practices in the areas of consumer sales that are subject to the Act. Id. (citing N.J.A.C. 13:45A-1.1 et seq.). The Court explained how that would have meant the defendant public utility could have been regulated by both the DCA and the Public Utilities Commission ("PUC"). Daaleman, supra, 77 N.J. at 272. However, the Court struck down that possibility, reasoning the Legislature intended for the PUC to regulate public utilities, and not the DCA, reasoning that if "separate state agencies [had] the right to exercise concurrent jurisdiction and control over [defendant]'s billings" there would have existed "a real possibility of conflicting determinations, rulings and regulations affecting the identical subject matter." Id.

Furthermore, in Daaleman, the Supreme Court emphasized the need to protect the financial stability of regulated industries, and found that precluding application of the CFA would achieve that goal. See id. The Court recognized that a privately-owned public utility must remain appealing to investors and be allowed a reasonable return on investment to serve public needs effectively. Id. Punitive assessments, such as the treble damages awarded to prevailing parties under the CFA, N.J.S.A. 56:8-19, are counterproductive as they lead to higher rates due to decreased investor interest and higher borrowing costs – which ultimately impacts public users. Daaleman, supra, 77 N.J. at 272. The Court found that treble damages against a public utility could harm the very consumers the Daaleman suit

intended to protect. Id. at 272–73. This rationale applies equally to casino gambling.

The Legislature expressly stated its desire for economic growth in Atlantic City in order to rebuild the City. N.J.S.A. 5:12-1(b)(13) ("It is in the public interest that the institution of licensed casino establishments in New Jersey be strictly regulated … pursuant to the provisions of this act … to provide an effective method of rebuilding and redeveloping existing facilities and of encouraging new capital investment in Atlantic City"). However, under the CFA, a prevailing plaintiff would be entitled to treble damages and counsel fees. N.J.S.A. 56:8-19 ("In any action under this section the court shall, in addition to any other appropriate legal or equitable relief, award threefold the damages sustained by any person in interest … the court shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit.") That is wholly inconsistent with the Legislature's goal of fostering a thriving casino industry to ensure Atlantic City's economic revival.

In fact, the Legislative intent of having economic development in Atlantic City and securing the resulting substantial tax revenues for state and local governments from casino gambling has been met. Today, the Atlantic City casino industry is a significant economic contributor, existing as one of the largest commercial gaming markets in the United States with nine casino properties.

Atlantic City Casino Industry Impact Report 2023, ATL. CITY COUNCIL (2023), https://online.fliphtml5.com/ivrx/yyjs/#p=1.

The industry is one of the largest employers in southern New Jersey, supporting tens of thousands of jobs.  Id.  As of 2023, the industry employed 22,634 individuals and contributed $681.95 million in taxes and fees.  Id.

Tax revenue from the industry is dedicated to seniors and persons with disabilities in New Jersey.  Id.  Examples of programs supported by the fund include New Jersey Transit Senior Citizen and Disabled Resident Transportation Assistance Program and the New Jersey Department of Human Services Community Care Program.  Id.  Furthermore, Casino Reinvestment Development Authority ("CRDA") obligations, derived from 1.25% of Casino Gross Revenue and 2.5% of Internet Gross Revenue, are a large segment of the taxes paid by casino operators.  Id.  In 2023, contributions to this tax totaling nearly $84 million were primarily used to pay down the debt of municipal Atlantic City, for general Atlantic City tax purposes and for special purposes in the tourism district.  Id.

Subjecting casinos to dual regulation under both the CCA and CFA would create uncertainty and inefficiency, potentially harming the business climate in Atlantic City.  Significant financial penalties, such as treble damages, would be inconsistent with the legislative intent for economic revitalization.  A uniform

15

regulatory environment is necessary to ensure clarity, predictability and fairness, which are crucial to maintain the industry's stability and growth.

The CCA's provisions are designed to address the specific regulatory needs of the casino industry, providing a range of sanctions and disciplinary actions to ensure penalties are proportional and tailored.  N.J.S.A. 5:12-129–30.  Since the DCA can sue a business for money damages, N.J.S.A. 17:16F-44, 48:3-84, it cannot regulate the casino industry without conflicting with the Legislature's intent to protect and foster the financial viability of casinos.  Instead, the Legislature established the CCC and DGE so that they could address issues specifically within the casino industry while adhering to the Legislature's public policy goals of maintaining public confidence in State oversight of casino gambling while simultaneously allowing casinos operate and contribute significantly to the State's economy.

Applying the CFA to this case would conflict with the Legislature's intent because it would mean the DCA could regulate casinos, and it is plain that the Legislature wanted the CCC and the DGE to have exclusive jurisdiction.  See Daaleman, supra, 77 N.J. at 273 (dismissing plaintiff's complaint because it was within the exclusive jurisdiction of the PUC and not cognizable under the CFA); Richardson v. Standard Guar. Ins. Co., 371 N.J. Super. 449, 466 (App. Div. 2004) (holding plaintiff's CFA claims did not apply where relief granted under the CFA

16

would have "collaterally alter[ed]" rates set by the Department of Banking and Insurance ("DOBI")).  It would also be inconsistent with the legislative goal of fostering economic growth in Atlantic City.  See id.

Plaintiff relies on Lemelledo to argue against a finding of preemption of the CFA due to an alleged the absence of a direct and unavoidable conflict between application of the CFA and application of the CCA to his claim.  150 N.J. at 270; App.'s Brief, ECF 19-1, at 25–29.  However, Lemelledo held that when "other … sources of regulation deal specifically, concretely, and pervasively with the particular activity, implying a legislative intent not to subject parties to multiple regulations that, as applied, will work at cross-purposes," then the CFA will not apply.  The comprehensive and specialized nature of the CCA's provisions demonstrates a clear legislative intent to preclude the application of the CFA to compulsive gambling and advertising practices.  See Greate Bay Hotel & Casino v. Tose, 34 F.3d 1227, 1232-33 (3d Cir. 1994) ("The 'statutory and administrative controls over casino operations [pursuant to the Act] . . . are extraordinary, pervasive and intensive.'").

By establishing a list of self-excluded persons and mandating public awareness campaigns, the CCA targets compulsive gambling with tailored, robust measures to comprehensively address the specific issues related to compulsive gambling and gambling advertising within the casino industry.  See N.J.S.A. 5:12-

71.2(a)-(b), -76.1(a), (b)(5), (b)(6).  Allowing the CFA to apply to these activities would create redundant and conflicting regulations, undermining the specialized approach and cohesive oversight intended by the Legislature in establishing the CCC and DGE.

## **<u>CONCLUSION</u>**

For the foregoing reasons, NJBIA, NJ Chamber and CIANJ request that this Court affirm the District Court's decision to grant Defendants' motion to dismiss Plaintiff's Complaint.

Respectfully Submitted,

*s/ David R. Kott*

David R. Kott, Esq. - NJ Attorney ID # 018131977
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
Telephone:  (973) 622-4444
dkott@mccarter.com
Attorneys for Proposed Amici Curiae
 *New Jersey Business & Industry
 Association, New Jersey Chamber of
 Commerce and Commerce and Industry
 Association of New Jersey*

Dated:  July 30, 2024

18

## COMBINED CERTIFICATIONS

I certify that I am admitted to practice before this Court pursuant to Third Circuit Local Appellate Rule 46.1(e).

I certify that this brief complies with the type-volume limitation excluding the parts of the brief pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 3,794 words, excluding the parts of the brief exempt by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Office Word 2007 in 14-point Times New Roman font.

Pursuant to Third Circuit Local Appellate Rule 31.1(c), I certify that the text of this electronic brief is identical to the text of the paper copies and that I have scanned the PDF version of this brief using McAfee VirusScan Enterprise version 8.8 and no virus was found.

Date: July 30, 2024

*s/ David R. Kott*

David R. Kott
**McCARTER & ENGLISH, LLP**
*Attorneys for Amici Curiae New Jersey Business & Industry Association, New Jersey Chamber of Commerce and Commerce and Industry Association of New Jersey*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 30, 2024, I caused the foregoing brief to be electronically filed through the ECF system of the United States Court of Appeals for the Third Circuit, which caused counsel of record to be served by ECF.

Date: July 30, 2024

*s/ David R. Kott*

David R. Kott
**McCARTER & ENGLISH, LLP**
*Attorneys for Amici Curiae New Jersey Business & Industry Association, New Jersey Chamber of Commerce and Commerce and Industry Association of New Jersey*